IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| STEPHANIE STUCKY, | ) CIVIL NO. 06-00594 JMS/KSC |
| | ) |
| Plaintiff, | ) ORDER (1) GRANTING |
| | ) DEFENDANTS STATE OF HAWAII |
| vs. | ) DEPARTMENT OF EDUCATION |
| | ) AND CATHERINE KILBORN'S |
| STATE OF HAWAII, DEPARTMENT | ) MOTIONS FOR SUMMARY |
| OF EDUCATION; PATRICIA | ) JUDGMENT; (2) DENYING |
| HAMAMOTO, Superintendent; KEN | ) PLAINTIFF'S MOTION FOR RULE |
| NOMURA, Complex Area | ) 56(f) CONTINUANCE; AND |
| Superintendent; CATHERINE | ) (3) STRIKING PORTIONS OF THE |
| KILBORN, Principal, | ) DECLARATION OF SAMUEL |
| | ) MOORE |
| Defendants. | ) |
| _____ | ) |

**ORDER (1) GRANTING DEFENDANTS STATE OF HAWAII
DEPARTMENT OF EDUCATION AND CATHERINE KILBORN'S
MOTIONS FOR SUMMARY JUDGMENT; (2) DENYING PLAINTIFF'S
MOTION FOR RULE 56(f) CONTINUANCE; AND (3) STRIKING
PORTIONS OF THE DECLARATION OF SAMUEL MOORE**

## I. INTRODUCTION

Defendants State of Hawaii Department of Education ("DOE"),

Patricia Hamamoto ("Hamamoto"), Ken Nomura ("Nomura"), and Catherine

Kilborn ("Kilborn") (collectively, "Defendants") seek summary judgment on all

claims in Plaintiff Stephanie Stucky's ("Plaintiff") May 29, 2007 First Amended

Complaint ("Complaint").  Plaintiff alleges that she was suspended and terminated

in retaliation for filing discrimination complaints against the DOE and Kilborn.

Defendants deny any retaliation on their part and argue that Plaintiff was suspended and terminated because she was unable to perform her job in a satisfactory manner.  Based on the following, the court GRANTS Defendants' motions for summary judgment.

## II. <u>BACKGROUND</u>

### A.    **Factual Background**

Plaintiff is a music teacher at Iao Intermediate School ("Iao") located on Maui.  Kilborn has been the principal of Iao since 2003 and has oversight of its teachers, including Plaintiff.  Since 1998, Plaintiff has filed several union grievances and civil rights complaints against the DOE and its employees based on her employment at Iao.  *See Stucky v. Hawaii Dep't of Educ.*, 2007 WL 602105 (D. Haw. Feb. 15, 2007).  Plaintiff alleges that Defendants retaliated against her for these filings.

During the 2005-2006 school year, Plaintiff taught seventh grade band.  Plaintiff alleges that at the beginning of the school year, Kilborn removed her class from the music room to the cafeteria, which was not suitable for music class and infested with fleas.[1]  Pl.'s Decl. ¶¶ 4-6.  Plaintiff sent a letter dated

---

[1] The court previously granted Defendants summary judgment in another civil action brought by Plaintiff based on these allegations.  *See Stucky v. Hawaii Dep't of Educ.*, 2007 WL 602105, at *5-6 (D. Haw. Feb. 15, 2007) ("Stucky also claims that her music classroom was

(continued...)

August 20, 2005 to Nomura, the Complex Area Superintendent, regarding the non-suitability of the cafeteria and included a notice bulletin regarding fleas. Defs.' Ex. C-113-15. Plaintiff then sent a copy of the letter addressed to Nomura and flea notice home with her students, without Kilborn's permission. Defs.' Ex. C-105, C-117. Kilborn received several complaints from parents based on the notice. Defs.' Ex. C-109, C-111.

On September 6, 2005, Kilborn held a conference with Plaintiff "to discuss parent and student complaints about class time being used by Ms. Stucky to discuss her dissatisfaction with her current room assignment" and the notice that was sent home with students. Defs.' Ex. C-105. According to Kilborn's conference summary:

> Ms. Stucky stated that she was glad that a parent called as her effort was to get parents to respond regarding her room as she had spent time to discuss this with students. Ms. Kilborn pointed out that the [parent] complaint was directed at Ms. Stucky's repeated use of class time to have these discussions and the perceived negative attitude. Ms. Stucky stated that the "parent can think what they want". Ms. Kilborn reiterated that

---

[1](...continued)
relocated to make room for a computer course, but that the Defendants did not relocate the other music teacher and either did not create the computer lab or delayed creating it for several months. Again, Stucky has failed to offer any evidence to show a nexus between her aged [Hawaii Civil Rights Commission] complaints and the classroom relocation. Further, Kilborn claims that the decision to relocate Stucky's music classroom was made by the school, and not her. . . . Stucky utterly fails to set forth facts to show that Kilborn acted out of a retaliatory motive." (footnotes omitted)).

> class time is to be used for instructional purposes and that complaining to students is considered unprofessional conduct and that this could not continue. . . .  Ms. Kilborn further stated that it is inappropriate for personal correspondence to be copied and distributed to students to be taken home and that notices, such as the vector control [flea] notice, are not to be distributed without proper clearance from administration.

*Id.*  Plaintiff asserts that she "conversed on school matters with parents, not personal ones."  Pl.'s Decl. ¶ 4.

On December 2, 2005, an accident occurred in Plaintiff's third period band class.  A female student was injured when a bench she had been sitting on with other students collapsed on her leg.  The injured student's parent, Donald McCann, sent a letter to Kilborn about the incident.  Defs.' Ex. A-26.  The letter states:

> Ms. Stucky instructed her to sit on a wooden bench with other students during the class, as they would not be performing in the upcoming concert.  While sitting on the bench two students began to rock the bench from side to side. The bench broke.  [Student] fell to the ground with the bench on top of her ankle with a large student on top of the bench. [Student] felt a sharp pain in her ankle and began to cry and ask for help.
> Ms. Stucky looked at her and turned away without saying a word.  Ms. Stucky did not offer aide or seek to evaluate the extent of her injury.  As she made no attempt to render aide, several other students picked [student] up and took her to the school nurse's office without any direction from Ms. Stucky.
> . . . .

4

I saw Ms. Stucky this morning and she said, "Ms.
Kilborn has not scheduled an appointment to get us together, as
I have instructed her". I told Ms. Stucky that we could talk
now if she wished. She said, "I don't know what your daughter
was doing in my 6th period class in the first place. She was not
going to perform at the concert and should not have been
there." I told her she was not in the 6th period class as we were
at the Kaiser clinic at that time. She said, "Oh, I don't know,
but you have to understand that I have 100 students and
administration does not support me. There are secret meetings
being held about me all the time." She said, "When the bench
broke students were laughing and the boys who broke the
bench were leaving the class and I had to decide should I chase
the boys or go help [student]." She confirmed that she did not
render aide.

I ended the conversation saying, you have told me
everything I need to know. I walked away. I was becoming
upset.

As Ms. Stucky appears to be unable to provide basic
classroom safety, or render aide to [an] injured student, I am
requesting that [student] be removed from Ms. Stucky's class
and be placed in the art class for her elective. Also, I request
that [student] not attend the band class while Ms. Stucky is the
teacher in charge of this class; as these issues remain
unresolved.

*Id.* Plaintiff argues that, "[r]egarding the McClain [sic] girl's injury in class when

the bench collapsed. Mr. McCain [sic] sent a letter of complaint, it's true.

However Plaintiff disagrees with his recitation of the facts, and he was not there I

was." Pl.'s Decl. ¶ 10. She claims that she "sent the McClain [sic] girl to the

nurse with several female students to obtain proper medical treatment. Plaintiff is

not a nurse nor qualified to render medical treatment. Plaintiff is a teacher who

was responsible for the other 100 students in her class, and delegated the transport

in a manner frequently done using students to assist the injured student."  Pl.'s

Decl. ¶ 12.  In response to the December 2, 2005 accident, Kilborn directed vice

principal Michael O'Neal ("O'Neal") to conduct an investigation.  Kilborn Decl.

¶ 8.

On January 3, 2006, Plaintiff filed a civil rights complaint in this

court claiming retaliation under Title VII, gender discrimination under Title IX,

and violations of the Hawaii Fair Employment Act based on: (1) a reprimand from

Kilborn for Plaintiff's failure to provide a written explanation of her grades and

grading policy; (2) Kilborn's delay or denial of Plaintiff's requests for supplies,

books, and instruments; (3) the music class being moved to the cafeteria, which

was infested with fleas; (4) Kilborn's reprimand of Plaintiff for attempting to

investigate the thefts of two ukeleles stolen from the cafeteria; and (5) replacing

Plaintiff's music class with a class in reading, mathematics, or world languages,

thereby eliminating Plaintiff's teaching position.  *See Stucky,* 2007 WL 602105, at

*1-2.

On January 9, 2006, Kilborn held a conference with Plaintiff

regarding various complaints received from "parents, students and teachers"

regarding Plaintiff's "1) classroom management, 2) professionalism, and

3) instruction."[2]  Defs.' Ex. C-10.  In response to the complaints about Plaintiff, Kilborn presented "corrective action options," including "mentoring, visitations to exemplary classrooms, classroom management class, directive relative to student release, PDRT to assist with curriculum mapping, pacing and alignment."  *Id.* When Kilborn received no written response from Plaintiff regarding these options, Kilborn directed Plaintiff to:

> 1)    Release students when the bell rings, at the end of class(es) so that they are not tardy for their following class.

_____

[2] Examples of complaints include: a November 2, 2005 letter from a parent to Kilborn regarding the amount of time Plaintiff spent during class discussing the controversy over curriculum assignment and her current teaching assignment, Defs.' Ex. C-23; a series of complaints from other teachers in November 2005 that Plaintiff had interrupted their classes to speak to students or that students were tardy because Plaintiff had kept them over at the end of Plaintiff's class time, Defs.' Ex. C-83-87; a December 3, 2005 letter from a parent stating that during class time Plaintiff "proceeded to talk about her law suit against the school and Mr. Kuraya and why she's entitled to be the band teacher as opposed to Mr. Kuraya," that Plaintiff "informed the students that she would appreciate if they would not go home and tell their parents what goes on in her class," that Plaintiff said to a student "Eh, retard in the front, now you know why you sit in the front," and that Plaintiff hit a student "very hard with her pencil . . . pinched another girl . . . while shoving her out the door," and "told the class to 'Shutup and sitdown. . . .'" Defs.' Ex. C-37; a December 5, 2005 letter from parents to Kilborn following a meeting they had with Plaintiff, regarding Plaintiff's grading policy, refusal to allow their student to participate in a band concert, and lack of control over her class, Defs.' Ex. C-26; a December 5, 2005 letter from a parent regarding "yelling, lack of instrument playing, and lack of classroom management," stating that Plaintiff "has been a poor role model to the students with her constant yelling and unprofessional behavior," and that "Plaintiff's anger towards the students has escalated," Defs.' Ex. C-48; and undated complaints from students to Kilborn as set forth in a December 20, 2005 email to Plaintiff from Kilborn, including that Plaintiff called students "double-stupid," that Plaintiff wanted to "humiliate" students and "threatened class that if anyone 'screwed up' during the performance teacher would point them out during the performance and make them pack up and leave," and that Plaintiff "spends a lot of time talking about herself and her problems." Defs.' Ex. C-28-29.

2)      Identify, in writing, by February 9, 2006, a classroom management course of study that you will attend.

3)      Participate in curriculum mapping/pacing instruction (arranged by administration).

4)      Refrain from discussing with students matters that are of a personal nature.

5)      Comply with requirements for the safety and supervision of students.

Failure to comply with these directives may result in disciplinary action including discharge.

Defs.' Ex. C-11.  On March 13, 2006, Plaintiff emailed the following to Kilborn:

I don't want to attend a classroom management course. You will not instruct me to identify, in writing, a classroom management course that I would like to attend.  Are you out of your mind?  Oh, and to top it all off, it was not an instruction by you to me but a DIRECTIVE by you.  And you actually spent time doing research for little ole me?  And you get paid for this?

And then you researched the possibility of a mentor for me?  What the H--- for?  I have not requested a mentor? . . .

Ms. Kilborn, do you not understand that everytime you write this kind of harassing garbage on a daily basis, it is very difficult to do my job, and that is teaching?  And can you imagine some principal doing this kind of stuff to you when you were a teacher?  It's very wearing and destructive.  What you are doing is not helping me, but destroying me as a teacher and a person.  Don't you see?  And the worst thing of all is that your being "stupid" with me is not making you look too together.  Can you imagine the evidence I have collected just in the last few months from you that is quite damaging to you? Honestly, what are you trying to accomplish?

Defs.' Ex. C-12.

### 1.      *Plaintiff's Suspension*

On January 13, 2006, O'Neal completed his investigation of the

December 2, 2005 accident and submitted his report to Kilborn.  The report

includes interviews with student witnesses and a written response from Plaintiff.[3]

─────────────────────

[3] Plaintiff submitted the following written response to O'Neal:

> There was an accident on Tuesday Dec. 6 during period 3 band.
> Students that were not going to be performing that evening were asked to
> sit at the side of the room on some benches that were brought out from
> practice rooms and hallway.  [Student] was sitting on a bench with three
> other boys (that I could see) and the leg on one side of the bench broke and
> all landed on the floor sliding down to one end.  [Student] had a brace on
> ankle to start with and apparently got it caught or hit by the bench as it
> came down.  The whole class was in an uproar.  The boys and [student]
> were in a stack also laughing from embarrassment.  No one knew [student]
> was hurt until the boys got up and ran out the door and suddenly there was
> [student] alone with her head down.  I had to deal then with crowd control
> since I'm all by myself with this angry mob so I stood up front and asked
> where the boys were that were on the bench with her to help her.  Four
> girls from up front ran up to help her and got her out to the health room.
> The boys came back in at that moment and then walked out with the girls
> to wherever.  I've never gotten the story on how many actually
> accompanied her to health room or wherever.
>
> Next thing I get an email from Kilborn saying that McCann said
> that basically I had ignored his daughter when she was hurt, etc. and a
> bunch of other stuff that the daughter had said I had done.  She demanded
> that I tell her my version.  I wrote back and said that I wanted us all to get
> together to talk about the incident and get each other's versions, especially
> since Mr. McCann was not even in the room to see what really happened.
> Kilborn has refused to get us all together so we can all get the same story
> and remedy the situation.  Instead she is now going to send the vice
> principal to investigate and question and then she will make her decision
> based on his version of the incident.  What's up with that?
>
> You mentioned filing and accident report.  I had so many things
> going that day hitting the face I never thought.  I will go ahead and file one
> now ok?

(continued...)

9

The report concludes that Plaintiff violated several DOE policies regarding student accidents and welfare "when she failed to render aid to [student], failed to assess the extent of [student's] injury and failed to seek assistance in evaluating and or treating [student's] injury," Defs.' Ex. A-8, and that she "acted inappropriately as a teacher and used unreasonable judgment and discretion."  Defs.' Ex. A-12.

Kilborn states that she reviewed the "investigative report and found that information gathered supported Mr. O'Neal's conclusion.  Therefore, I recommended that the Plaintiff be suspended."  Kilborn Decl. ¶ 14, attached to Defs.' Reply.  Kilborn sent memoranda dated January 27, 2006 to Nomura and Plaintiff, recommending that Plaintiff be suspended without pay.  Defs.' Ex. C-135-36.  On March 21, 2006, Nomura sent a memorandum to Plaintiff notifying her of his decision to suspend her without pay for three days, commencing April 5, 2006.  Defs.' Ex. C-139 ("After carefully reviewing the recommendation, other relevant documents submitted by Mrs. Kilborn; written comments by Eric Nagamine, HSTA Uni-Serve Director [Plaintiff's union representative]; and our meeting on March 20, 2006, I concur with the recommendation made.").

---

[3](...continued)
This whole past five weeks have been an experience.  All blatant violations of the law.  And everyone knows it.  Please help me.

Defs.' Ex. A-4-6.

On April 24, 2006, Plaintiff filed a union grievance seeking to overturn the suspension without pay, based on alleged violations of the collective bargaining agreement between teachers and the DOE. Defs.' Ex. A. According to Plaintiff, her union "is finding that the due process and rule violations tainted the whole investigation process," and that the "report was inaccurate and biased." Pl.'s Decl. ¶¶ 11, 13. According to Samuel Moore ("Moore"), a union representative for the Hawaii State Teacher's Association ("HSTA"):

> There was a complete denial of due process in Ms. Stucky's suspension. The attitude and process used was "You will be accused and tried, but only the prosecution can come to the trial, you will be judged guilty, and then you can comment on it.["] That is contained in written form.[4] There was Total disregard of the contract due process provisions. This denial of due process procedure is being used for any teacher issue or complaint, beyond.

Moore Decl. ¶¶ 5-6.[5] Regarding violations of contract due process provisions, Moore claims that:

> At the hearing I asked what is the origin [of] this rule. The DOE people then went out and huddled and said we have to

---

[4] Plaintiff has not submitted any documents or exhibits evidencing what Moore purports "is contained in written form."

[5] "Moore Declaration" or "Moore Decl." refers to the Samuel Moore Declaration filed on January 8, 2008 (Doc. No. 110) -- portions of which have been stricken -- and not the Moore declaration submitted on November 15, 2007 in opposition to Defendants' motions, which was stricken in its entirety on December 20, 2007 ("Original Moore declaration"). *See* discussion of Moore Declaration in section II.B.2, *infra*.

withdraw the rule allegedly violated because it was not from
the State of Hawaii Department of Education.

Moore Decl. ¶ 8.  Moore also alleges that "Susan Kitsu, runs the [DOE] office of civil

rights compliance.  She said she did not care, that this is her procedure and this is

what they're using.  She said she would do what she has to do and that I can do what I

have to do."  Moore Decl. ¶ 4.  Further, Moore asserts: "That the principal Catherine

Kilborn dislikes Stephanie Stucky is obvious."  Moore Decl. ¶ 3.

In response to the Original Moore declaration, the DOE submitted the

declaration of Robyn Honda, a DOE Personnel Regional Officer with the Maui

District Office.  According to Honda, "during the course of the hearing the

investigation report was submitted for the hearing officer's consideration.  Instead,

Exhibit B attached to the investigation report was deleted, without objection from

the union because it was deemed irrelevant to the case."  Honda Decl. ¶ 6.  Exhibit

B to the investigation report is a one-page document entitled "Student Accidents,"

which describes the actions to be taken in an emergency at school.  Defs.' Ex. B,

attached to Defs.' Reply.

In response to Moore's other claims, Kitsu states that the

conversation she had with him did not relate to Plaintiff, but instead, concerned

"an ongoing investigation conducted by my office as to complaints of

12

discrimination that occurred in a high school on Oahu."  Kitsu Decl. ¶ 3, attached

to Defs.' Reply.  According to Kitsu:

> During this conversation, Mr. Moore stated his belief that the HSTA, under the collective bargaining agreement, had a right to review complaints made against its members before an investigation was completed and a finding of misconduct was determined.
>
> I informed Mr. Moore that the collective bargaining agreement did not provide for this type of disclosure.  We concluded our conversation when I told him that we were not going to come to an agreement on this issue and that my office intended to complete the investigation.  Therefore, I told Mr. Moore that: "you are going to have to do what you have to do and I am going to do what I have to do."
>
> At no time did we discuss Stephanie Stucky or any grievances filed on her behalf.

Kitsu Decl. ¶¶ 4-6, attached to Defs.' Reply.

With respect to the injured student, Plaintiff now claims that the

HSTA, "after looking at student's medical history, found that the child had leg

problems inherited from both parents and that the incident in class that day did not

create any injury that already wasn't there."  Pl.'s Decl. ¶ 11.  Plaintiff's grievance

regarding suspension without pay has not yet been resolved.

//

//

//

13

2.      *Plaintiff's "Unsatisfactory" Evaluation and Termination*

Plaintiff was scheduled for a job performance evaluation at the end of the 2005-2006 school year, under the Professional Evaluation Program for Teachers ("PEP-T").  On May 25, 2006, Kilborn rated Plaintiff "unsatisfactory" overall.  Defs.' Ex. C.  The 200-plus page evaluation includes the PEP-T rating form, which indicates that Plaintiff was rated "marginal" in two of five duty areas, and "unsatisfactory" in the other three.  Defs.' Ex. C-1.  The evaluation also includes summaries of conferences Kilborn held with Plaintiff, complaints from parents and students about Plaintiff, a copy of O'Neal's investigation report, notes from Kilborn's classroom observations, and several emails between Plaintiff and Kilborn.  Defs.' Ex. C.

For example, a March 13, 2006 conference summary report written by Kilborn indicates that the conference was held "to discuss a complaint from the parent regarding name calling in general and detaining the student after class causing him to be late to the next class and specific complaint from student regarding the teacher calling him a bitch."  Defs.' Ex. C-42.  Plaintiff responded at the conference "that she does not recall the incident and that she would not call students' names."  *Id.*  As a result of the conference between the parent, Plaintiff, and Kilborn, the parent "stated that she would not meet with [Plaintiff] again and

14

that she wanted her child removed from the class stating that she felt [Plaintiff] was unstable."  Defs.' Ex. C-43.

Memoranda from Kilborn to Plaintiff indicate that Plaintiff was reprimanded in 2005 and 2006 for: (1) twice failing to use the appropriate system for requesting a substitute teacher, Defs.' Ex. C-76; (2) failing to lock up and secure standardized test materials on campus, Defs.' Ex. C-78; and (3) misuse in reporting personal leave as jury duty.  Defs.' Ex. C-80-83.

Emails between Kilborn and Plaintiff indicate that Kilborn removed several students from Plaintiff's band class at a parent's request, including one parent who felt Plaintiff was "harassing her daughter," Defs.' Ex. C-33, and another female student who was removed because Plaintiff "told her that if she remains in [Plaintiff's] class, [Plaintiff] will send her to the office every day. . . . She says [Plaintiff] told her [Plaintiff] can't stand to see her."  Defs.' Ex. C-71.

A May 5, 2006 email from Kilborn to Plaintiff addresses an email that Plaintiff copied to several parents regarding discipline problems with other students.  One of the parents who received Plaintiff's email was upset because the email contained discipline information about several students, which Kilborn states "is inappropriate/unethical to share with another parent."  Defs.' Ex. C-88. As a result, Kilborn agreed with the parent's request that the student be removed

from Plaintiff's class.  *Id.*  Another parent recipient of Plaintiff's email responded

directly to Plaintiff that "I will not be put in the middle of any internal issues, Mrs.

Stucky, and would prefer if you do not forward messages that include

documentation of the behavior of other students to me."  Defs.' Ex. C-89.

       Plaintiff alleges, without evidentiary support, that Kilborn solicited

the complaints against her.  Pl.'s Decl. ¶ 45 ("Defendant Kilborn continued her

discrimination, harassment, and retaliation against Plaintiff . . . by soliciting false

reports, complaints, investigations, conferences, directives, letters, e-mails,

anonymous notes and phone messages, evaluations, observations, all to set up

documentation for a specific reason, (to discriminate, harass and retaliate), and

ALL in violation of the Collective Bargaining Agreement (CBA).").  Kilborn

responds that the complaints from teachers, students, and parents were not

solicited by her or anyone from the school; rather, "[t]hese complaints were

initiated by the parents, teachers, and the students themselves."  Kilborn Decl.

¶ 11, attached to Defs.' Reply.

       Plaintiff also believes that the "unsatisfactory" evaluation was the

result of Kilborn's bias against her.  A January 23, 2006 email from Plaintiff to

Kilborn with the subject line "RE: PEP-T" states:

> What's amazing is that I don't think you have listened to anything I have said to you.  It just never ends.  What do I have to do?  File a lawsuit against you for harrassment and retaliation?
>
> I will ask you again as to whether you honestly think you could do an objective evaluation of me as a music teacher and without prejudice?  And have you given any thought to what I think about you evaluating me?

Defs.' Ex. C-202.  In another email to Kilborn, Plaintiff states: "I find it interesting that suddenly this year you have become obsessed with PEP-T-ing me and determined to follow the process despite my many requests for a waiver and reasons for request."  Defs.' Ex. C-203.  Kilborn responded: "With regards to historical evaluations, you are correct that this is the first time I will be rating you as it is the first time you have come up in the rating cycle for the PEP-T."  Defs.' Ex. C-204.  In an April 13, 2006 email to Kilborn, Plaintiff stated:

> I'm sure you will really give me a constructive evaluation based on your expertise relative to music education teaching and techniques.  (I'm a little concerned about this part).  However this PEP-T process is all going to help me to become the best I can be as a teacher.  This whole process is to help and keep quality teachers, not to destroy and get rid of them, and especially darn good, older, seasoned, reputable, highly qualified teachers.

Defs.' Ex. C-199.  After meeting with Kilborn to go over her PEP-T evaluation, Plaintiff emailed Kilborn the following:

17

>In reading the PEP-T Manual again and reading on page 1 that specific procedures, detailed in this manual offer assurances that the evaluation/rating process will be open, fair and accurate, I see no assurances.  There are no specific procedures detailed in this manual that assures that the process is OPEN, FAIR, and ACCURATE.  The PEP-T allows the evaluator to subjectively evaluate teachers and solely upon the evaluator's personal values and opinions.  The closest thing to any interaction between the evaluator and "evaluatee" is the mention of an "opportunity" for the teacher and evaluator to engage in "professional dialogue"?

Defs.' Ex. C-209.

According to Plaintiff, the "unsatisfactory evaluation was in retaliation for Plaintiff having filed [a Hawaii Civil Rights Commission] & EEOC complaint."  Pl.'s Decl. ¶ 14.  She also claims that "the so called complaints were unfounded, unsubstantiated and all of the children cannot play the lead in all concerts.  Some children have more musical talent than others.  Plaintiff grades on a curve and disgruntled parents regarding grades are not unusual or grounds for termination."  *Id.*

Kilborn explains that she "rated the performance of the Plaintiff in accordance with the departmental rating cycle.  This cycle is determined by the department and not under the control of a school or principal.  Accordingly, I was required to rate the Plaintiff at the close of the 2005-2006 school year."  Kilborn Decl. ¶ 16, attached to Defs.' Reply.  The evaluation itself indicates that, "From

the outset, Ms. Stucky resisted the PEP-T process, requesting multiple times that she be exempt from this obligation.  She was informed that there was no provision for an exception and that she would be rated."  Defs.' Ex. C-198.

On June 1, 2006, Plaintiff filed a union grievance regarding her "unsatisfactory" evaluation.  The grievance form states that the collective bargaining agreement was violated because the "Principal refused to discuss the rating with the grievant.  The Principal did NOT provide the grievant with any documentation to support the alleged PEP-T rating issued."  Defs.' Ex. D.

According to Kilborn, "[s]hortly after the evaluation was concluded, the Department of Education relieved the Plaintiff of teaching duties and placed Plaintiff on departmental leave.  This leave allowed Plaintiff to receive all of her employment benefits."  Kilborn Decl. ¶ 9.  On June 9, 2006, Kilborn recommended that Plaintiff be terminated because of unsatisfactory job performance.  *See* Pl.'s Ex. 22.

On July 13, 2006, Plaintiff filed a complaint with the Hawaii Civil Rights Commission ("HCRC") alleging retaliation based on her suspension, "unsatisfactory" rating, and termination.  On July 21, 2006, Plaintiff was placed on department-directed leave with pay for ten working days.  Pl.'s Ex. 24.  In an August 1, 2007 letter to Plaintiff, Nomura informed Plaintiff that he concurred

19

with Kilborn's recommendation for her termination upon "conferring with

Principal Kilborn and carefully reviewing the recommendation submitted by

Principal Kilborn; your comments through your union representative in meetings

on June 21, 2006, June 29, 2006, and July 18, 2006; and other associated

supporting documents."  Pl.'s Ex. 22.  According to Nomura, "[t]he reason for my

recommendation is your overall unsatisfactory rating as indicated in your PEP-T

Final Rating Form dated May 25, 2006."  Pl.'s Ex. 22.

On August 4, 2006, DOE Superintendent Hamamoto notified Plaintiff

that her department-directed leave with pay was extended "to provide additional

time to complete the process of the recommendation for termination."  Pl.'s Ex.

26.  According to Plaintiff, she is "locked out of the school and her class room

pending termination."  Pl.'s Decl. ¶ 2.

## B.    Procedural Background

Plaintiff filed her original complaint in this action on November 2,

2006.  On March 20, 2007, the court dismissed the following claims against

Kilborn in her individual capacity: violation of Title VII (Count I); violation of

Title IX (Count II); and violation of 42 U.S.C. § 1983 (Count V).  *See* Doc. No.

21.  Plaintiff filed her amended Complaint on May 29, 2007 alleging "subsequent

acts of retaliation," including suspension and termination.  *See generally* Compl.

20

The Complaint includes the following causes of action: Title VII retaliation claim against the DOE (Count I); Title IX sex discrimination claim against the DOE (Count II); retaliation claim against all Defendants for violation of the State of Hawaii Fair Employment Act, Hawaii Revised Statutes ("HRS") chapters 368 and 378 (Count III); punitive damages claim against all Defendants (Count IV); 42 U.S.C. § 1983 claim that individually named Defendants retaliated against Plaintiff for filing complaints and applied rules in a discriminatory manner (Count V); intentional infliction of emotional distress ("IIED") claim against the individually named Defendants (Count VI); § 1981 claim against individually named Defendants, alleging Plaintiff was illegally discriminated against based on her race and female gender (Count VII); Title VI claim against the DOE (Count VIII); another § 1983 claim alleging the individually named Defendants discriminated and retaliated against Plaintiff (Count IX); and violation of the Age Discrimination Act of 1967 ("ADEA") against the DOE (Count X).  Plaintiff seeks injunctive relief, $10,000,000 in damages, and attorney's fees.

## 1.    *Motions for Summary Judgment*

The DOE and Kilborn filed separate motions for summary judgment on October 3, 2007.  The DOE's motion (on behalf of the DOE and employees Kilborn, Nomura, and Hamamoto in their official capacities) seeks summary

judgment on the grounds that: several claims are barred by the Eleventh Amendment; Plaintiff fails to establish valid claims under Title VI, Title VII, and Title IX; and that punitive damages are not an independent cause of action. Kilborn's motion for summary judgment argues that: the § 1983 retaliation claims against her are barred to the extent they are based on Title VII violations; Plaintiff cannot maintain § 1983 claims against her based on the First Amendment or Equal Protection Clause; Plaintiff's § 1981 claim in Count VII fails because the Complaint does not state that Plaintiff is a member of a racial minority and the actions complained of were based on Plaintiff's unacceptable conduct and not her race; Plaintiff cannot establish a prima facie case for her HRS chapter 378 retaliation claim; and that even if Plaintiff could establish a prima facie case for any of the alleged violations, she cannot carry her burden to establish pretext.

Plaintiff filed her opposition on November 15, 2007.  Defendants filed a reply on November 21, 2007.  A hearing was held on December 3, 2007.

## 2.      *Plaintiff's Rule 56(f) Motion Regarding the Moore Declaration*

On December 20, 2007, the court held a status conference at the request of the parties.  At the status conference, the parties advised the court that during a December 19, 2007 deposition, Moore stated that he had not seen and did not sign the declaration attributed to him that was submitted with Plaintiff's

opposition on November 15, 2007. The declaration contained a purported electronic signature, "/s/ Samuel Moore," in the space for Moore's signature. At the December 20, 2007 status conference, Plaintiff's counsel, Andre Wooten, admitted that Moore had not signed the declaration.[6] The court struck the declaration dated November 15, 2007, and granted Plaintiff until December 21, 2007 to file a motion seeking leave to supplement the record.

After several unsuccessful attempts at filing, on December 27, 2007, Plaintiff filed a "Second Motion Allowing Filing of Samuel Moore Deposition in Lieu of Draft Declaration," (Doc. No. 97), with an attached "Declaration of Andre

---

[6] According to Wooten, he spoke with Moore regarding Plaintiff's case in October and November 2007. On November 15, 2007 -- the day Plaintiff's opposition was due -- Wooten emailed a draft declaration to Moore for Moore's review and signature, which Wooten drafted based on his notes from their conversation, but did not receive a response from Moore. Wooten submitted the declaration with Moore's purported electronic signature to the court on November 15, 2007. Wooten again emailed Moore on November 28, 2007, but did not receive a response. Apparently, Moore was out of the office during this time for medical reasons and did not receive Wooten's emails. *See* Wooten Decl. ¶¶ 3-10, attached to Pl.'s Second Mot. (Doc. No. 97).

At the December 3, 2007 hearing on Defendants' motions for summary judgment, Wooten did *not* advise the court that Moore had not signed the declaration attributed to him, even though the Moore declaration itself and the issues it addressed were raised at the hearing.

Wooten emailed Moore again on December 12, 2007. Moore replied to this email that he would not sign the declaration "because it contains much that is simply my opinion." Pl.'s Ex. 3-A (Doc. No. 103). After receiving this email, Wooten did *not* advise the court that Moore did not sign and would not sign the declaration he had submitted on November 15, 2007. It was not until Moore's deposition on December 19, 2007 that Defendants became aware that Moore had not signed the declaration attributed to him.

Wooten."[7]  Later on December 27, 2007, Defendants filed a memorandum in

opposition to the motion.  The court held a status conference on Plaintiff's Rule

56(f) motion on December 28, 2007.

At the status conference, the court noted that during the December 3,

2007 hearing on Defendants' motions for summary judgment, Wooten acted as if

the declaration had, in fact, been agreed to and signed by Moore, and therefore,

that he deliberately misled the court.  Further, the court found that as of December

12, 2007, Wooten knew that Moore would not sign the declaration, but that for

over a week, until December 20, 2007, Wooten did not inform the court.  It

appears that, but for Defendants' discovery that Moore had not signed his original

_____

[7] Plaintiff attempted to file several documents electronically with the court's CM/ECF system.  On December 21, 2007, Plaintiff electronically filed a "Rule 56(f) Motion to Allow Filing of Deposition of Samuel Moore In Lieu of Draft Declaration" (Doc. No. 90).  The motion was filed improperly; the Declaration of Andre Wooten, attached to the motion was not electronically signed.  Plaintiff was instructed to resubmit a corrected filing.  No exhibits were attached to the electronically-filed motion.  On December 21, 2007, Plaintiff also filed courtesy copies of the Rule 56(f) Motion (Doc. No. 90) in the court's after-hours filing box.  The courtesy copies included six exhibits, which were *not* attached to the electronically-filed version.  On December 22, 2007, Plaintiff electronically filed a "Supplemental Declaration of Andre Wooten in Support of Plaintiff's Rule 56(f) Motion," which included Exhibits 4 and 5.  (Doc. No. 91).  The supplemental declaration was again filed improperly.  A corrective entry was made by the clerk's office instructing Plaintiff to resubmit a corrected filing.

On December 26, 2007, in order to prevent confusion and possible prejudice to Defendants, the court struck these filings and granted Plaintiff until December 26, 2007 to resubmit the documents in compliance with all applicable rules.  Subsequently, Plaintiff filed another Supplemental Declaration of Andre Wooten (Doc. No. 94), and a "Declaration of Andre Wooten," with an attached memorandum (Doc. No. 95); because neither of these filings complied with the court's December 26, 2007 Order (Doc. No. 93), the court struck them as well. (Doc. No. 96).

declaration, Wooten intended to have this court rely on a declaration not signed or ratified by Moore. Such conduct appears to be fraud on the court.

To be clear, the record shows that as of December 12, 2007 -- after the motion had been argued on December 3, 2007 and was under submission -- Wooten knew that Moore would not sign the declaration that Wooten had submitted as signed. The court could have issued an order on Defendants' motions at any time, without the knowledge that Moore's purported declaration was not valid. Further, but for Moore's December 19, 2007 deposition and the December 20, 2007 status conference, the court would not have known that the declaration was not valid. Under the circumstances, it appears that Wooten had no intention of informing the court of the matter.

Because Plaintiff's Rule 56(f) motion was untimely,[8] and due to Wooten's lack of diligence,[9] the court denied Plaintiff's request to submit Moore's deposition testimony in place of his unsigned declaration. At the December 28,

---

[8] "A Rule 56(f) motion must be brought before the summary judgment hearing. . . . Failure to comply with these requirements is a proper ground for denying relief." *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1000 (9th Cir. 2002); *see also Ashton-Tate Corp. v. Ross*, 916 F.2d 516, 520 (9th Cir. 1990) (requiring that "a Rule 56(f) motion be made prior to the summary judgment hearing").

[9] Wooten did not provide a copy of the draft declaration to Moore until November 15, 2007 -- the day Plaintiff's opposition was due -- and made no showing as to why he waited until the 11th hour to do so. "The failure to conduct discovery diligently is grounds for the denial of a Rule 56(f) motion." *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1005 (9th Cir. 2002).

25

2008 conference, the court found that Wooten acted in bad faith by providing a false declaration.  The court, however, granted Plaintiff until January 7, 2008 (later extended to January 14, 2008), to file a declaration of Samuel Moore consistent with -- but no broader than -- Wooten's notes memorializing his conversation with Moore, which were attached as Plaintiff's Exhibit 4.  The court specifically instructed Wooten during the December 28, 2007 conference that the declaration could not "be broader than what is set forth in your notes and cannot include any information beyond what is set forth in your notes."  The court further warned Plaintiff that if the declaration went beyond the court's instructions, that the entire declaration would be stricken.  On January 8, 2008, Plaintiff submitted the Declaration of Samuel Moore.[10]

On January 16, 2008, Defendants filed a memorandum in reply to the Moore Declaration, arguing that portions of the declaration exceed the information contained in Wooten's notes.  The court agrees.  Although the Moore Declaration

---

[10] Attached to the declaration was Plaintiff's Exhibit 35, a page from the medical report of the student injured while in Plaintiff's class.  On January 10, 2008, Plaintiff filed a "Rule 56(f) Motion to Allow Filing of Exhibit 35 Attached to the Signed Deposition of Samuel Moore Filed January 8, 2008." (Doc. No. 111).  Defendants filed an opposition on January 16, 2008.  Plaintiff argues that Moore's illness and absence from work beginning sometime after November 15, 2007 -- the date Plaintiff's opposition was due -- excuses any lack of diligence in conducting discovery.  The court disagrees.  Further, Plaintiff's motion -- filed over one month after the summary judgment hearing -- is not timely.  The court DENIES Plaintiff's Rule 56(f) motion seeking the filing of Exhibit 35.

generally adheres to the scope of Wooten's notes, portions of the declaration go beyond what was permitted by the court's instructions by adding facts or details not contained in the notes.  In other words, it is broader than the matters set forth in Wooten's notes.  Rather than striking the entire Moore Declaration, however, the court strikes only those portions of the declaration that violate the court's specific instructions.  Those portions of the declaration that improperly expound upon the content of the notes or attempt to provide additional information supporting Moore's assertions will not be considered by the court and are STRICKEN.[11]

---

[11] Upon review of Wooten's notes and the declaration as submitted, and after striking the improper portions of the declaration, the Moore Declaration reads as follows:

1. Declarant is a union representative for the Hawai'i State Teachers' Association.

2. Declarant believes the State's case relating to [the] unsatisfactory job performance evaluation, thus the termination, hinges on the Suspension without pay issue which I believe we should win in arbitration.  Based upon over three decades of experience here, I do not believe that an arbitrator would view the DOE's attempt at the suspension over the McCann girl's alleged injury when the bench collapsed as legitimate.

3. That the principal Catherine Kilborn dislikes Stephanie Stucky is obvious.

4. Susan Kitsu, runs the office of civil rights compliance.  She said she did not care, that this is her procedure and this is what they're using.  She said she would do what she has to do and that I can do what I have to do.

5. There was a complete denial of due process.  The attitude and process used was "You will be accused and tried, but only the prosecution can come to the trial, you will be judged guilty, and

(continued...)

## III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The burden initially lies with the moving party to show that there is no genuine issue of material fact.  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  Nevertheless, "summary judgment is mandated if the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case.'"  *Broussard*

---

(...continued)

> then you can comment on it.["]  That is contained in written form. There was Total disregard of the contract due process provisions.
>
> 6.   This denial of due process procedure is being used for any teacher issue or complaint, beyond.
>
> 7.   Ms. Stucky's instructions to the other students to help the McCann girl[.]
>
> 8.   At the hearing I asked what is the origin [of] this rule.  The DOE people then went out and huddled and said we have to withdraw the rule allegedly violated because it was not from the State of Hawaii Department of Education.
>
> 9.   The DOE's suspension decision then was based upon the wrong rules and data.
>
> 10.  The girl and the father testified to things that were proven false by the medical records which stated that the braces the girl was wearing on her legs on the day in[.]
>
> 11.  The girl and the father testified to things that were proven false by the medical records which stated that the braces the girl was wearing on her legs on the day in question prevented her from injury.  Also her testimony showed the bench could not have hit her legs as was charged in the investigation.
>
> 12.  Stephanie Stucky was justified in mentioning and grieving the contract violations happening to her.

28

*v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999) (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

At the summary judgment stage, a litigant may not rest on its pleadings and the factual allegations contained therein. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (A party cannot "rest on mere allegations or denials of his pleading" in opposing summary judgment). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* Thus, in responding to a defendant's purportedly undisputed facts, the plaintiff must set forth, by affidavit or otherwise as provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Id.* at 250.

An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. An issue is material if the resolution of the factual dispute affects the outcome of the claim or defense under substantive law governing the case. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co. v.*

29

*Zenith Radio*, 475 U.S. 574, 587 (1986).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007).

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses[.]" *Celotex*, 477 U.S. at 323-24.  "There is no genuine issue of fact if the party opposing the motion 'fails to make an adequate showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (*quoting Celotex*, 477 U.S. at 322).  Moreover, there is no genuine issue of material fact if, taking the record as a whole, a rational trier of fact could not find in favor of the non-moving party.  *Matsushita*, 475 U.S. at 586; *Taylor*, 880 F.2d at 1045.

//

//

//

//

//

30

# IV.  ANALYSIS

## A.    Claims Against Defendants in Their Official Capacities

Plaintiff has sued the DOE and three of its employees, Hamamoto, Nomura, and Kilborn, in their official capacities.  Compl. ¶¶ 2-5.[12]  The Eleventh Amendment bars Plaintiff's §§ 1981, 1983, ADEA and state law claims against the DOE[13] and the named Defendants to the extent that Plaintiff seeks retrospective or compensatory damages.  *See Blaycock v. Schwinden*, 862 F.2d 1352, 1353 (9th Cir. 1988) ("[A] suit against state officials that seeks retroactive money damages, to be paid from the state treasury, is barred by the eleventh amendment as a suit against the state."); *see also Mitchell v. L.A. Comm. Coll. Dist.*, 861 F.2d 198, 201 (9th Cir. 1988) (holding in a lawsuit brought by a teacher that "the district is a state entity that possesses eleventh amendment immunity from the appellant's section 1981, 1983 and 1985 claims in damages and for injunctive relief. Likewise, the individual defendants share in the district's eleventh amendment immunity because they were sued in their official capacities"); *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 67 (2000) (holding that the ADEA did not validly

---

[12] Kilborn is also sued in her individual capacity.  Compl. ¶ 5.

[13] *See Office of Hawaiian Affairs v. Dep't of Educ.*, 951 F. Supp. 1484, 1492 (D. Haw. 1996) (holding that the DOE is a state agency entitled to Eleventh Amendment immunity).

abrogate states' Eleventh Amendment immunity from suit by private individuals); *Bator v. Hawaii*, 910 F. Supp. 479, 485 (D. Haw. 1995) (holding that HRS chapter 378 claims against the state are barred by the Eleventh Amendment); *Mukaida v. Hawaii*, 159 F. Supp. 2d 1211, 1217 (D. Haw. 2001) (suits based on state tort claims barred).

       Some of Plaintiff's claims reference "the Defendants, each of them jointly and severally," while others address "the individually named Defendants." To the extent that Plaintiff's claims in Count III (HRS ch. 378), Count V (§ 1983), Count VI (IIED), Count VII (§ 1981), Count IX (§ 1983), and Count X (ADEA) allege claims seeking money damages against the DOE or the named individuals in their official capacities, those claims are barred by the Eleventh Amendment. Further, because the court GRANTS Defendants' Motions for Summary Judgment on all claims (as discussed below), injunctive relief is not available to Plaintiff because there are no violations of law to be enjoined.

       The DOE's Motion for Summary Judgment is GRANTED as to Count III (HRS ch. 378), Count V (§ 1983), Count VI (IIED), Count VII (§ 1981), Count IX (§ 1983), and Count X (ADEA).

//

//

**B.     Title VI, Title VII, and Title IX Claims Against the DOE**

The DOE seeks summary judgment on Plaintiff's claims that the DOE retaliated against her for filing discrimination complaints in violation of Title VII (Count I); discriminated against her on the basis of her gender in violation of Title IX (Count II); and discriminated against her on the basis of race, age, and gender in violation of Title VI (Count VI).  The court addresses each claim in turn.

*1.     Title VII*

*a.     Legal framework*

Under Title VII, an employer may not discriminate against an employee because the employee has opposed an employment practice made unlawful by Title VII.  42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice [prohibited by Title VII] . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."); *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2410 (2006) ("Title VII's anti-retaliation provision forbids employer actions that discriminate against an employee . . . because he has opposed a practice that Title VII forbids or has made

a charge, testified, assisted, or participated in a Title VII investigation, proceeding, or hearing." (citations and quotation signals omitted)).

To make a prima facie showing of retaliation, Plaintiff must show that (1) she engaged in a protected activity; (2) Defendants took an adverse action against her; and (3) there was a causal link between her involvement in the protected activity and the adverse personnel action undertaken by the Defendants. *Freitag v. Ayers*, 468 F.3d 528, 541 (9th Cir. 2006); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004). An adverse employment action is one that a reasonable employee would find to be materially adverse, or which would dissuade a reasonable worker from filing a discrimination charge. *Burlington N. & Santa Fe Ry. Co.*, 126 S. Ct. at 2415.

The *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework applies to Plaintiff's retaliation claims. *See McGinest*, 360 F.3d at 1124.

   b.   *Plaintiff's prima facie case*

Plaintiff has set forth a prima facie case of retaliation; namely, she alleges that she was suspended and terminated in retaliation for filing her January 3, 2006 federal complaint and July 13, 2006 Complaint with the HCRC. *See Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1148 (9th Cir. 1997) ("The

34

requisite degree of proof necessary to establish a prima facie case for Title VII . . .

on summary judgment is minimal and does not even need to rise to the level of a

preponderance of the evidence.").

         *c.*    *DOE's non-retaliatory rationale*

       The DOE sets forth legitimate, non-retaliatory reasons for its actions;

according to the DOE, the actions Plaintiff complains of were taken as a direct

result of her inappropriate conduct as a teacher.  With respect to her three-day

suspension, the investigation concluded that Plaintiff violated DOE polices when

she failed to aid the injured student, failed to seek proper medical assistance, failed

to contact the student's parent, and failed to follow up on the student's condition.

Defs.' Ex. A-12.  Plaintiff's failure to follow proper procedures when the student

was injured is a valid, non-retaliatory reason for her suspension.

       The DOE asserts that Plaintiff's "unsatisfactory" PEP-T rating was

given for several reasons, including the many complaints about Plaintiff's conduct

received from parents and students, classroom observations of Plaintiff that

showed an inability to control her class and effectively present material, and

Plaintiff's refusal to take courses on classroom management or work with a

teacher mentor to improve her effectiveness.  *See* Defs.' Ex. C-12-16.  The DOE's

stated rationale is supported by the substantial record of parent and student

complaints and Plaintiff's refusal to undertake any measures to address them.  As a

result of her unsatisfactory job performance, Kilborn and Nomura recommended

that Plaintiff be terminated.  Pl.'s Ex. 23.  Plaintiff's failure to perform her job in a

satisfactory manner is a legitimate, non-retaliatory reason for her PEP-T rating and

termination.

> ### d.    Plaintiff fails to demonstrate pretext

Plaintiff "bears the ultimate burden of submitting evidence indicating

that the [Defendants'] proffered reason is merely a pretext for a retaliatory

motive." *Nilsson v. City of Mesa*, 503 F.3d 947, 954 (9th Cir. 2007) (citation and

quotation signals omitted); *see also Vasquez v. County of L.A.*, 349 F.3d 634, 641

(9th Cir. 2003) ("A plaintiff can show pretext directly, by showing that

discrimination [or retaliation] more likely motivated the employer, or indirectly,

by showing that the employer's explanation is unworthy of credence.").  Plaintiff

can make either showing through direct or circumstantial evidence of retaliation.

*See Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005).  "Direct

evidence typically consists of clearly sexist, racist, or similarly discriminatory [or

retaliatory] statements or actions by the employer."  *Id.*  Circumstantial evidence

requires an additional inferential step to demonstrate retaliation.  *Id.*  In order to

survive summary judgment, the circumstantial evidence offered by Plaintiff "must

36

be 'specific and substantial' to defeat the employer's motion for summary judgment." *Id.* (citation omitted); *Mondero v. Salt River Project*, 400 F.3d 1207, 1213 (9th Cir. 2005); *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 743 (9th Cir. 2004).[14] Plaintiff needs to do more than merely deny the credibility of Defendants' proffered reason. *See Schuler v. Chronicle Broad. Co.*, 793 F.2d 1010, 1011 (9th Cir. 1986).

As set forth below, Plaintiff fails to offer direct or circumstantial evidence from which a reasonable jury could conclude that Defendants suspended, evaluated, or terminated Plaintiff in retaliation for filing discrimination complaints.

i.      Alleged contractual due process violations

Plaintiff argues that she has met her burden of showing pretext by "[p]ointing to rule violations in the investigation leading up to and including the imposition of the suspension as well as HSTA-DOE contract violations in the PEP-T evaluation process conducted by Defendant Kilborn." Pl.'s Opp'n 20.

---

[14] Although *Cornwell v. Electra Central Credit Union*, 439 F.3d 1018, 1030-31 (9th Cir. 2006) questioned whether a "specific and substantial" showing is required, the three-judge panel did not overrule the applicability of this standard. In fact, *Nilsson v. City of Mesa*, 503 F.3d 947, 954 (9th Cir. 2007), applied the "specific and substantial" standard after *Cornwell* questioned its applicability. The court applies the "specific and substantial" standard to the present matter.

Defendants argue that Plaintiff's uncorroborated expressions of personal belief do not establish pretext.

The only support submitted for Plaintiff's pretext argument is the portion of the Moore Declaration not stricken by the court. The declaration attempts to show that the reasons given for the suspension and evaluation were pretextual because (1) Plaintiff's "due process rights" under the HSTA-DOE collective bargaining agreement were violated, and (2) that Kilborn disliked Plaintiff. As to the first claim, Moore's Declaration does not allege which HSTA-DOE contract provisions were violated.[15] Moore Decl. ¶¶ 5-6. He claims that Plaintiff's suspension was improper because, "[a]t the hearing I asked what is the

_____

[15] Moore opines that:

> The attitude and process used was "You will be accused and tried, but only the prosecution can come to the trial, you will be judged guilty, and then you can comment on it.["] That is contained in written form[.] There was Total disregard of the contract due process provisions. This denial of due process procedure is being used for any teacher issue or complaint, beyond.

Moore Decl. ¶¶ 5-6. The factual basis for this opinion is unclear. Moore neither specifies which contract provisions were violated, nor does he provide any examples of other instances to support his claim that "[t]his denial of due process procedure is being used for any teacher issue or complaint, beyond." Nor does Plaintiff provide the court any evidence of what he alleges "is contained in written form."

Further, Moore's allegation that the DOE repeatedly employed a "denial of due process procedure" for "*any* teacher issue or complaint" (emphasis added), militates against Plaintiff's argument that the denial of her contractual due process rights in this case was in retaliation for her protected activity. Rather, this claim, if true, implies that the DOE used the same allegedly improper procedure for other teacher's issues or complaints, regardless of retaliatory motive.

origin [of] this rule.  The DOE people then went out and huddled and said we have to withdraw the rule allegedly violated because it was not from the State of Hawaii Department of Education."  Moore Decl. ¶ 8.

According to Regional Personnel Specialist Honda, "Exhibit B attached to the investigation report was deleted, without objection from the union because it was deemed irrelevant to the case."  Honda Decl. ¶ 6.  Exhibit B to the investigation report is a one-page document entitled "Student Accidents," which describes the actions to be taken in an emergency at school.  Defs.' Ex. B, attached to Defs.' Reply.

The report, in fact, concludes that Plaintiff violated several *DOE policies*, including "[Board of Education]/DOE Policies Title: Student Safety and Welfare Series: 4200 Series-Student Welfare Statute #: 4200," because "she failed to render aid to [student], failed to assess the extent of [student's] injury and failed to seek assistance in evaluating and or treating [student's] injury," Defs.' Ex. A-8, and further, that she "acted inappropriately as a teacher and used unreasonable judgment and discretion."  Defs.' Ex. A-12.  Even viewing the facts in the light most favorable to Plaintiff, Moore's conclusory assertion that the DOE withdrew a single allegedly non-DOE rule attached to the investigation report, does not

demonstrate that the DOE's proffered explanation for the suspension (i.e. that Plaintiff violated several DOE rules) was pretextual.[16]

Further, Plaintiff's argument assumes that the knowledge of any procedural deficiencies in O'Neal's investigation report can be imputed to Kilborn, who recommended suspension, or Nomura, who ultimately suspended Plaintiff.  In fact, the record is devoid of evidence (1) that Kilborn or Nomura directed O'Neal during the course of the investigation; or (2) that Kilborn or Nomura were aware of the alleged deficiencies *before* Plaintiff's suspension.  If neither Kilborn nor Nomura directed O'Neal's investigation in any manner, and if neither Kilborn nor Nomura were aware of the alleged deficiencies before the suspension was ordered, then any actual deficiencies in O'Neal's report (or the process leading to the report) could not have played a role in the suspension.  Put another way, Plaintiff has failed to present any evidence to show that the non-retaliatory reason for her suspension was pretextual.

---

[16] This is not a case in which the alleged violations in the investigative process were independently evaluated.  *Cf. Metoyer v. Chassman*, 504 F.3d 919, 940 (9th Cir. 2007) (finding genuine issue whether discriminatory animus prompted and influenced an investigation of plaintiff done by auditing firm at behest of employer where an independent C.P.A. evaluated the methodology used in the investigation and "concluded that there were questions concerning whether the investigation truly encompassed all outstanding grants . . . and suggested that the other grants were only mentioned in the report to prevent the appearance that [plaintiff's] grants were the target of the investigation," and the C.P.A.'s opinion was supported by the statement of a second witness that "during his interview with [the auditing firm], the focus was on [plaintiff]").

Moore's claims regarding his conversation with Kitsu concerning contract violations are similarly unsupported and do not show that the DOE's stated reason for suspending Plaintiff is unworthy of credence.[17]   Although the exact date of the telephone conversation between Moore and Kitsu is unclear, it occurred sometime during the grievance process, *after* Plaintiff had been suspended.  Further, Plaintiff does not dispute that Kitsu played no role in the investigation and was not involved in the decision to suspend or terminate Plaintiff.  Even construing the facts in the light most favorable to the non-moving party, Plaintiff fails to set forth specific and substantial evidence that any contract

---

[17] Moore claims that Kitsu "said she did not care, that this is her procedure and this is what they're using.  She said she would do what she has to do and that I can do what I have to do."  Moore Decl. ¶ 4.  Kitsu states that the conversation she had with Moore did not relate to Plaintiff, but instead, concerned "an ongoing investigation conducted by my office as to complaints of discrimination that occurred in a high school on Oahu."  Kitsu Decl. ¶ 3, attached to Defs.' Reply.  According to Kitsu:

> During this conversation, Mr. Moore stated his belief that the HSTA, under the collective bargaining agreement, had a right to review complaints made against its members before an investigation was completed and a finding of misconduct was determined.
> I informed Mr. Moore that the collective bargaining agreement did not provide for this type of disclosure.  We concluded our conversation when I told him that we were not going to come to an agreement on this issue and that my office intended to complete the investigation.  Therefore, I told Mr. Moore that: "you are going to have to do what you have to do and I am going to do what I have to do."
> At no time did we discuss Stephanie Stucky or any grievances filed on her behalf.

Kitsu Decl. ¶¶ 4-6, attached to Defs.' Reply.

41

provisions were violated with respect to the investigation report, other than Plaintiff's and her union representative's bare assertions. "In the absence of specific facts, as opposed to allegations, showing the existence of a genuine issue for trial, a properly supported summary judgment motion should be granted." *Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. La. Hydrolec*, 854 F.2d 1538, 1545 (9th Cir. 1988).

With respect to Plaintiff's PEP-T evaluation, she claims that the contract was violated because the "Principal refused to discuss the rating with the grievant. The Principal did NOT provide the grievant with any documentation to support the alleged PEP-T rating issued." Defs.' Ex. D.[18] Like Plaintiff's vague contract violation allegations regarding the suspension, her subjective belief that the PEP-T evaluation violated the collective bargaining agreement does not, without more, demonstrate pretext. Plaintiff has not shown through admissible evidence that Kilborn was required to discuss the matter further or provide her documentation; in fact, Plaintiff has not provided the court with any collective bargaining agreement to draw its own conclusions. Plaintiff simply alleges that she was not given the documentation supporting the rating when she met with

---

[18] According to Honda, Plaintiff's grievance regarding the evaluation has not proceeded to hearing, "[h]owever, neither Ms. Stucky nor her union specifically advised me of any violation of departmental rules or policies in connection with this grievance." Honda Decl. ¶ 8.

Kilborn.  This does not show pretext.  *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) ("[W]hile pretext can be demonstrated by 'not only shifting but also conflicting, and at times retracted, justifications for adverse treatment,' it is not shown where an employer 'simply supplemented its explanation' where 'there has been no retraction of any of its reasons,' and 'nor are any of its reasons inconsistent or conflicting.'" (*quoting Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733-34 (7th Cir. 2001)).[19]

In short, the vague, conclusory, and unsubstantiated assertions of contract violations contained in Plaintiff's and Moore's declarations do not establish that the DOE's explanation is merely pretext for retaliation.

ii.     Kilborn's retaliatory animus

Secondly, in addition to the alleged contract violations, Plaintiff claims that her suspension, evaluation, and termination are the result of Kilborn's

---

[19] Defendants submitted a "true and correct copy of the Plaintiff's job performance evaluation, with redactions of the names of students," as Exhibit C to the DOE's motion for summary judgment.  Kilborn Decl. ¶ 8.  This 212-page filing includes Plaintiff's one-page PEP-T rating form; complaints in the form of letters, emails, and memoranda from parents, students, and teachers regarding Plaintiff's job performance; summaries of conferences with Plaintiff prepared by Kilborn; the suspension investigation report; and emails between Plaintiff and Kilborn.  Defs.' Ex. C.  Whether or not Plaintiff was presented with the entirety of this 200-plus page evaluation when she met with Kilborn does not implicate the veracity of Defendants' stated reason for Plaintiff's "unsatisfactory" rating; namely, that she did not perform her job in a satisfactory manner.  Nor does it show that retaliation more likely motivated the decision to rate Plaintiff "unsatisfactory."

bias against her, which is evidence of pretext.  The court disagrees; other than Plaintiff's self-serving assertions, there is no evidence of bias or animosity by Kilborn.

On January 23, 2006, Plaintiff emailed Kilborn: "I will ask again as to whether you honestly think you could do an objective evaluation of me as a music teacher and without prejudice?"  Defs.' Ex. C-202.  In another email to Kilborn, Plaintiff states: "I find it interesting that suddenly this year you have become obsessed with PEP-T-ing me and determined to follow the process despite my many requests for a waiver and reasons for request."  Defs.' Ex. C-203.[20]  These statements by Plaintiff fail to show any evidence of retaliatory motive on the part of Kilborn, who was required to evaluate Plaintiff in the regular course of her duties as principal.

//

//

//

---

[20] According to Kilborn, she "rated the performance of the Plaintiff in accordance with the departmental rating cycle.  This cycle is determined by the department and not under the control of a school or principal.  Accordingly, I was required to rate the Plaintiff at the close of the 2005-2006 school year."  Kilborn Decl. ¶ 16, attached to Defs.' Reply.  Plaintiff has not contradicted this statement.  Further, the evaluation itself indicates that, "From the outset, Ms. Stucky resisted the PEP-T process, requesting multiple times that she be exempt from this obligation.  She was informed that there was no provision for an exception and that she would be rated."  Defs.' Ex. C-198.

Further, Plaintiff's claim that Kilborn solicited the complaints from parents, students, and other teachers is not supported by any evidence.[21]  Plaintiff asserts that "the so called complaints were unfounded, unsubstantiated and all of the children cannot play the lead in all concerts.  Some children have more musical talent than others.  Plaintiff grades on a curve and disgruntled parents regarding grades are not unusual or grounds for termination."  Pl.'s Decl. ¶ 14.  Plaintiff's *belief* that the complaints were unfounded is not supported by any *evidence* in the record.[22]

---

[21] Kilborn maintains that the complaints from teachers, students, and parents were not solicited by her or anyone from the school; rather, "[t]hese complaints were initiated by the parents, teachers, and the students themselves."  Kilborn Decl. ¶ 11, attached to Defs.' Reply.

[22] There is also no evidence supporting Moore's conclusory statement, "That the principal Catherine Kilborn dislikes Stephanie Stucky is obvious."  Moore Decl. ¶ 3.  *See Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005) (holding that "conclusory statements of bias do not carry the nonmoving party's burden in opposition to a motion for summary judgment"); *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 & n.6 (11th Cir. 1998) ("Most of the affiants' statements contain conclusory and generalized allegations of racial bias, much of which was properly struck by the district court. . . .  For example, statements by affiants that the Courtland facility 'was a racially hostile environment,' or that 'there was a racially biased attitude by management towards minority black employees,' were properly struck as conclusory."); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) (finding summary judgment appropriate in a Title VII religious discrimination case where plaintiff merely alleged subjective bias on the part of supervisor and could not describe with specificity any alleged disparaging remarks, and holding: "To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases").  Even construing the facts in the light most favorable to Plaintiff, Moore's unsubstantiated, personal opinion that Kilborn "dislikes Stephanie Stucky" does not demonstrate that the DOE's stated reason for Plaintiff's evaluation and termination is unworthy of credence -- especially in light of substantial evidence that Plaintiff was not performing well -- and does not show pretext.

(continued...)

Finally, Plaintiff's subjective belief that she performed her job satisfactorily -- not supported by any evidence other than her own bare assertion -- does not establish pretext. "A plaintiff may not defeat a defendant's motion for summary judgment merely by denying the credibility of the defendant's proffered reason for the challenged employment action." *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1029 n.6 (9th Cir. 2006) (citations omitted). "Nor may a plaintiff create a genuine issue of material fact by relying solely on the plaintiff's subjective belief that the challenged employment action was unnecessary or unwarranted." *Id.*; *see also Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996) (concluding that "an employee's subjective personal judgments of her competence alone do not raise a genuine issue of material fact").

In short, Plaintiff relies exclusively on the opinions contained in her declaration and Moore's declaration to demonstrate that the DOE's explanation is pretext for retaliation. The subjective beliefs contained in the declarations, however, do not constitute specific and substantial evidence sufficient to

---

[22](...continued)

Further, Plaintiff has set forth no evidence of retaliatory motive based on any specific conduct or statements made by Kilborn. *Cf. Metoyer*, 504 F.3d at 939 (finding direct and circumstantial evidence of retaliation where: (1) "Chassman accused Metoyer of encouraging SAG employees to come forward with complaints of racial discrimination and became angry that Metoyer was sowing discontent by raising allegations of discrimination," and (2) when plaintiff raised the issue of a fraudulent EEO report, a senior manager "responded vindictively, 'That bitch, I'm going to get that bitch,'" and shortly thereafter, plaintiff was suspended).

overcome summary judgment.  *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1028 (9th Cir. 2001) ("The only evidence supporting a retaliation claim, in all of the papers submitted or even mentioned in the summary judgment proceedings, was a statement by [plaintiff] in her deposition that she believed she was denied a position because of her lawsuit: 'I believe it's because of this court case.' . . .  A plaintiff's belief that a defendant acted from an unlawful motive, without evidence supporting that belief, is no more than speculation or unfounded accusation about whether the defendant really did act from an unlawful motive."); *Tarin v. County of L.A.*, 123 F.3d 1259, 1265 (9th Cir. 1997) ("Because [plaintiff] points to nothing in the record, other than her own conclusory statements, to refute the County's explanations for its decisions, we affirm the district court's grant of summary judgment to defendants with respect to [plaintiff's] claims of unlawful retaliation."); *Lindsey v. Shalmy*, 29 F.3d 1382, 1385 (9th Cir. 1994) ("Mere conclusory assertions of discriminatory intent, embodied in affidavits or deposition testimony, cannot be sufficient to avert summary judgment.  The court must satisfy itself that there is sufficient direct or circumstantial evidence of intent to create a genuine issue of fact for the jury, before it can deny summary judgment . . . ."); *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993) ("When the nonmoving party relies only on its own affidavits to oppose summary

47

judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact.").

In sum, Plaintiff has presented neither direct evidence nor set forth "specific and substantial" circumstantial evidence that Defendants' explanations for her suspension, "unsatisfactory" evaluation, and termination were pretext for retaliation. Because Plaintiff has not met her burden on summary judgment, the DOE's motion is GRANTED with respect to Count I.

### 2. *Title IX*

Count II alleges that the DOE discriminated against Plaintiff because she is female, in violation of Title IX, which prohibits discrimination on account of sex in any education program or activity that receives federal financial assistance. *See* 20 U.S.C. §§ 1681-1688. Title VII principles guide the resolution of Title IX discrimination claims. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n.1 (2d Cir. 2000); *Johnson v. Baptist Med. Ctr.*, 97 F.3d 1070, 1072 (8th Cir. 1996) ("[T]he method of evaluating Title IX gender discrimination claims is the same as those in a Title VII case."); *Preston v. Commonwealth of Virginia ex rel. New River Comm. College*, 31 F.3d 203, 207-08 (4th Cir. 1994) (holding that a Title IX discrimination claim can be evaluated in accordance with principles governing Title VII claims); *see also Gallant v. Bd. of Trs. of Cal. State Univ.*, 997

F. Supp. 1231, 1233 (N.D. Cal. 1998); *Patricia H. v. Berkeley Unified Sch. Dist.*, 830 F. Supp. 1288, 1290 (N.D. Cal. 1993) ("[A]ppellate courts have turned to the substantial body of case law developed under Title VII for assistance in interpreting Title IX.  Because Title VII prohibits the identical conduct prohibited by Title IX; i.e., sex discrimination, we regard it as the most appropriate analogue when defining Title IX's substantive standards." (citation and quotation signals omitted)).

Even construing the facts in the light most favorable to her, Plaintiff fails to establish a prima facie case of sex discrimination.  There is no evidence that she was treated any differently because of her female sex.  Her Complaint alleges: "Male teachers did not receive the same adverse treatment that Plaintiff received."  Compl. ¶ 40.  Plaintiff offers no support for this bare allegation in opposition to summary judgment.  Further, even if Plaintiff had set forth a prima facie case, her Title IX claim must fail for the same reason as her Title VII claim; she fails to demonstrate pretext.  The DOE's motion is GRANTED as to Count II.

### 3.     *Title VI*

Plaintiff alleges in Count VIII that she was discriminated against "on the basis of race, age, and female gender, thereby violating Title VI, 42 U.S.C. § 2000(d)."  Compl. ¶ 52.  Title VI allows an employee of an educational

49

institution that receives federal funding to sue the employer for *race* or *national origin* discrimination -- not age or gender discrimination. *See* 42 U.S.C.§ 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."). The court applies the same burden-shifting framework to Plaintiff's Title VI claim. *See Hankins v. Temple Univ.*, 829 F.2d 437, 440-41 (3d Cir. 1987); *Quarles v. Oxford Mun. Separate Sch. Dist.*, 868 F.2d 750, 754 n.3 (5th Cir. 1989) (indicating *McDonnell Douglas* analysis would be applicable to Title VI claim); *Chandamuri v. Georgetown Univ.*, 274 F. Supp. 2d 71, 84 (D.D.C. 2003) (applying Title VII analysis to a retaliation claim under Title VI).

Plaintiff agreed at the December 3, 2007 hearing that the record did not show any evidence of discrimination based on Plaintiff's race. Even if Plaintiff had made a prima facie showing of race discrimination, Plaintiff is unable to demonstrate that the DOE's reason for suspending and terminating her was pretext. The DOE's motion is GRANTED with respect to Count III.

In sum, the court GRANTS the DOE's Motion for Summary Judgment on all Counts.

50

**C.     Claims Against Kilborn in Her Individual Capacity**

Kilborn seeks summary judgment on Plaintiff's §§ 1983, 1981, and state-law claims brought against her in her individual capacity.[23]

*1.     Section 1983 Claims*

Plaintiff's Complaint contains two indistinguishable § 1983 claims: Count V alleges (under the heading "Title VII, Violation of 42 U.S.C. § 1983, Illegal Retaliation Under Color of State Law"[24]) that Plaintiff suffered illegal retaliation, Compl. ¶ 44, and Count IX alleges she was "illegally discriminated against and retaliated against." Compl. ¶ 54. Kilborn construes these claims as

---

[23] Because the court finds that Plaintiff's federal rights were not violated and Plaintiff's state-law claims are without merit, the court does not reach Kilborn's claim that she is entitled to qualified immunity on the federal claims and official immunity on the state claims.

[24] To the extent Plaintiff argues that Title VII may serve as the basis for her § 1983 claim, she is reminded that the court previously addressed this issue. On March 21, 2007, the court granted Kilborn's motion to dismiss the § 1983 claim based on Title VII and Title IX *with Plaintiff's agreement*:

> **Violation of 42 U.S.C. § 1983 (Count V):** Plaintiff agrees that the claim for violation of § 1983 as presently pled in the Complaint is based on allegations of Title VII and Title IX violations. As such, the court GRANTS Defendant Kilborn's motion as to § 1983 claims based on Title VII and Title IX violations.

Mar. 21, 2007 Order at 2 (Doc. No. 21). Plaintiff's attempt to re-allege the same violation and to argue that such claims are legally permissible in contravention of the court's previous Order will not be permitted.

alleging (1) a First Amendment retaliation claim, and (2) an Equal Protection Clause violation.

### a.     First Amendment retaliation

In order to state a First Amendment retaliation claim, a government employee must show (1) that he or she engaged in protected speech; (2) that the employer took adverse employment action; and (3) that his or her speech was a substantial or motivating factor for the adverse employment action.  *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003).

Kilborn claims that Plaintiff's speech is not protected and relates only to personnel matters.[25]  Plaintiff appears to claim that she was punished for sending parents the notice regarding fleas -- not merely for complaining about

---

[25] Plaintiff's speech is protected to the extent it addresses a matter of public concern, but is unprotected to the extent it deals with personnel disputes or grievances.

> An employee's speech is protected under the First Amendment if it addresses "a matter of legitimate public concern."  [S]peech that concerns issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government merits the highest degree of first amendment protection. On the other hand, speech that deals with "individual personnel disputes and grievances" and that would be of no relevance to the public's evaluation of the performance of governmental agencies is generally not of "public concern."  The determination of whether an employee's speech deals with an issue of public concern is to be made with reference to the content, form, and context of the speech.

*Coszalter v. City of Salem*, 320 F.3d 968, 973-74 (9th Cir. 2003) (citations and some quotation signals omitted; brackets in original).

personnel matters -- and that "the talking she did concerned . . . work conditions and not her personal life. . . . Even if the principal does not like complaints about fleas, ticks and rats, when students are being bitten, it is an appropriate subject of public concern for discussion with the class and their parents." Pl.'s Opp'n 15. Even assuming, however, that Plaintiff engaged in protected speech,[26] she fails to meet her burden as to the third-prong on summary judgment.

*Keyser v. Sacramento City Unified School District*, 265 F.3d 741 (9th Cir. 2001), lists three ways in which a plaintiff can use circumstantial evidence to show that retaliation was a substantial or motivating factor behind a defendant's adverse employment actions. First, a plaintiff can introduce evidence regarding the "proximity in time between the protected action and the allegedly retaliatory employment decision," from which a "jury logically could infer [that the plaintiff] was terminated in retaliation for his speech." *Id.* at 751 (citation and quotation signals omitted). Second, a plaintiff can introduce evidence that the "employer expressed opposition to his speech, either to him or to others." *Id.* Third, a

---

[26] The parties did not brief, and the court does not reach, the issue raised in *Garcetti v. Ceballos*, 126 S. Ct. 1951, 1960 (2006), in which the Supreme Court held "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." As the Ninth Circuit stated recently, "to qualify as 'protected speech' under the first element, the employee must have uttered the speech as a citizen, not an employee." *Marable v. Nitchman*, --- F.3d ---,  2007 WL 4485342, at *4 (9th Cir. Dec. 26, 2007).

plaintiff can introduce evidence that "his employer's proffered explanations for the adverse employment action were false and pretextual." *Id.* at 752.

With respect to timing, Plaintiff sent the letter with the flea notice home to parents in early September 2005; Kilborn recommended her suspension in late January 2006 and rated her "unsatisfactory" in May 2006. Thus the proximity in time is fairly close between the protected action and the allegedly retaliatory employment decisions. With respect to timing, however, the Ninth Circuit has held that context matters:

> There is no set time beyond which acts cannot support an inference of retaliation, and there is no set time within which acts necessarily support an inference of retaliation. Whether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in the light of the timing and the surrounding circumstances. In some cases, the totality of the facts may form such a clear picture that a district court would be justified in granting summary judgment, either for or against a plaintiff, on the issue of retaliatory motive; but the length of time, considered without regard to its factual setting, is not enough by itself to justify a grant of summary judgment.

*Coszalter*, 320 F.3d at 978. Under the totality of the circumstances and in light of Plaintiff's documented job-related deficiencies, the proximity between Plaintiff's speech and the adverse employment actions is not sufficient to overcome summary judgment.

Beyond the bare facts of the timing, Plaintiff fails to demonstrate that Defendants' non-retaliatory reasons for her suspension, evaluation, and termination were pretext for retaliation based on the letter and flea notice she sent to parents. Rather, the record shows that she was counseled by Kilborn during a September 5, 2005 conference that "complaining to students is considered unprofessional conduct" and that "notices, such as the vector control [flea] notice, are not to be distributed without proper clearance from administration." Defs.' Ex. C-105. Plaintiff has not otherwise shown any nexus between her speech and any adverse employment action; in short, the record does not demonstrate that Plaintiff was suspended or terminated because of any protected speech.

Plaintiff has not met her burden on summary judgment by setting forth sufficient evidence establishing a material dispute as to whether retaliation was a substantial or motivating factor of Kilborn's actions.[27] To the extent

---

[27] It is Plaintiff's burden to show that her constitutionally protected speech was a motivating factor in Defendants' adverse employment action. *Marable*, 2007 WL 4485342, at *7 n.10.

Even if Plaintiff were able to make a prima facie case, Kilborn would be able to demonstrate that no First Amendment violation occurred. If Plaintiff makes a prima facie showing, the burden shifts to Defendants to demonstrate either that (1) their "legitimate administrative interests outweigh the [Plaintiff's] First Amendment rights" or (2) that they "would have reached the same decision even in the absence of [Plaintiff's] protected conduct." *Thomas v. City of Beaverton*, 379 F.3d 802, 808 (9th Cir. 2004) (*quoting Ulrich v. City & County of S.F.*, 308 F.3d 968, 976-77 (9th Cir. 2002)). Under this second prong, the DOE has established that it would have suspended and terminated Plaintiff based on her job performance alone, even in the absence of any protected speech.

Plaintiff alleges a First Amendment violation, Kilborn's Motion for Summary Judgment is GRANTED.

        b.    *Equal protection violation*

Kilborn also moves for summary judgment on Plaintiff's § 1983 claims to the extent they allege a violation of equal protection.  Although her § 1983 Counts do not specify the federal right violated, Plaintiff alleges elsewhere in her Complaint that "Male teachers did not receive the same adverse treatment that the Plaintiff received."  Compl. ¶ 51.  "The Equal Protection Clause of the Fourteenth Amendment confers a federal constitutional right to be free from gender discrimination at the hands of government actors."  *Lindsey*, 29 F.3d at 1385 (citation and quotation signals omitted).  State employees have a clearly established constitutional right not to be refused employment because of their sex.  *Bator v. State of Hawaii*, 39 F.3d 1021, 1028 (9th Cir. 1994).  On summary judgment, the pertinent inquiry is whether Plaintiff "set forth sufficient facts showing a genuine issue for trial that she suffered purposeful, invidious harassment in violation of the Equal Protection Clause."  *Id.* at 1029 (citation and quotation signals omitted).

To set forth a prima facie violation of the Equal Protection Clause a plaintiff first must prove a discriminatory intent or purpose.  *Vill. of Arlington*

*Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).  Conclusory

allegations by themselves do not establish an equal protection violation without

further proof of invidious discriminatory intent.  *Id.*  Plaintiff has set forth no

evidence of intentional discrimination based on her gender -- or any other

protected status.  Nor has Plaintiff set forth evidence that she was treated

differently than any similarly situated employee not of her protected class.

Instead, the record shows that the adverse employment actions complained of were

the consequence of Plaintiff's job performance and unrelated to her gender.  The

court GRANTS Kilborn's motion as to Counts V and IX.

      **2**.    ***Section 1981 Claim***

      Section 1981 provides, in pertinent part, that "all persons within the

jurisdiction of the United States shall have the same right . . . to make and enforce

contracts" without regard to race.  42 U.S.C. § 1981(a); *see also McDonald v.*

*Santa Fe Trail Transp. Co.*, 427 U.S. 273 (1976); *Patterson v. County of Oneida,*

*N.Y.*, 375 F.3d 206, 224 (2d Cir. 2004) (Section 1981 "outlaws discrimination with

respect to the enjoyment of benefits, privileges, terms, and conditions of a

contractual relationship, such as employment.").  "[T]he term 'make and enforce

contracts' includes the making, performance, modification, and termination of

contracts, and the enjoyment of all benefits, privileges, terms, and conditions of

the contractual relationship." 42 U.S.C. § 1981(b).  A prima facie case of racial

discrimination in cases brought under § 1981 requires proof of intentional

discrimination.  *Gay v. Waiters' & Dairy Lunchmen's Union, Local No. 30*, 694

F.2d 531, 537 (9th Cir. 1982).

Plaintiff admitted during the December 3, 2007 hearing that she

presented no *evidence* to the court as to her race.[28]  In any event, even if she had

established her race, there is no evidence that she was treated any differently than

any other employee on account of race.  The court therefore GRANTS Kilborn's

motion with respect to Count VII.

### 3.    State Law Claims

#### a.    HRS Chapter 378 claim

Under HRS § 378-2(2), it is unlawful for any employer to "discharge,

expel, or otherwise discriminate against any individual because the individual has

opposed any practice forbidden by this part or has filed a complaint, testified, or

assisted in any proceeding respecting the discriminatory practices prohibited under

this part."  The court applies the Title VII burden-shifting framework to Plaintiff's

---

[28] Although Plaintiff's Memorandum in Opposition states that she is Japanese-Caucasian, this argument is not evidence.  *See Certain Underwriters at Lloyds, London v. Inlet Fisheries, Inc.*, 370 F. Supp. 2d 974, 977 (D. Alaska 2004) ("Statements by counsel in briefs do not constitute evidence and can neither sustain nor defeat a motion for summary judgment.").

58

retaliation claim under HRS § 378-2.  *See Schefke v. Reliable Collection Agency, Ltd.*, 96 Haw. 408, 426, 32 P.3d 52, 70 (2001); *Villiarimo*, 281 F.3d at 1064.

Although Plaintiff may assert a state-law retaliation claim against Kilborn in her individual capacity, this claim fails for the reasons discussed above with respect to her Title VII claim against the DOE; she has failed to demonstrate that the legitimate, non-retaliatory reasons offered by Kilborn for her suspension, evaluation, and termination are pretextual.  Kilborn's Motion for Summary Judgment is GRANTED as to Count III.

b.      IIED claim

In Hawaii, "the elements of the tort of intentional infliction of emotional distress are 1) that the act allegedly causing the harm was intentional or reckless, 2) that the act was outrageous, and 3) that the act caused 4) extreme emotional distress to another."  *Hac v. Univ. of Haw.*, 102 Haw. 92, 106-07, 73 P.3d 46, 60-61 (2003).  "The term 'outrageous' has been construed to mean 'without just cause or excuse and beyond all bounds of decency.'  Moreover, 'extreme emotional distress' constitutes, *inter alia*, mental suffering, mental anguish, nervous shock, and other 'highly unpleasant mental reactions.'"  *Enoka v. AIG Haw. Ins. Co.*, 109 Haw. 537, 559, 128 P.3d 850, 872 (2006) (citations omitted).

59

Plaintiff's opposition briefly addresses her IIED claim (in one sentence on the final page), arguing that the claim should survive: "because the Defendants Kilborn and DOE's actions in this case are pre-meditated, malicious discriminatory and retaliatory. . . ." Pl.'s Opp'n 30.  Beyond this single sentence in the brief, Plaintiff has set forth no evidence that Kilborn acted "without just cause or excuse and beyond all bounds of decency" or that Plaintiff suffered "extreme emotional distress."  Summary judgment is mandated because Plaintiff, the non-moving party, fails to make a showing sufficient to establish the existence of at least two elements essential to her case.  *See Broussard*, 192 F.3d at 1258; *see also Taylor*, 880 F.2d at 1045 ("There is no genuine issue of fact if the party opposing the motion 'fails to make an adequate showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (*quoting Celotex*, 477 U.S. at 322)).  Kilborn's motion is GRANTED as to Count VI.

In sum, the court GRANTS Kilborn's Motion for Summary Judgment on all claims.

## D.    Punitive Damages

Plaintiff agrees that punitive damages cannot constitute a separate claim.  A claim for punitive damages is not an independent tort, but a remedy that

is incidental to another cause of action.  *See Ross v. Stouffer Hotel Co. (Hawaii) Ltd.*, 76 Haw. 454, 466, 879 P.2d 1037, 1049 (1994) (holding that a claim for punitive damages "is not an independent tort, but is purely incidental to a separate cause of action").  Defendants' motions are GRANTED as to Count IV.

## V.  **CONCLUSION**

The court GRANTS the DOE's motion as to: Title VII (Count I), Title IX (Count II), HRS ch. 378 (Count III), punitive damages (Count IV), IIED (Count VI), Title VI (Count VIII), and ADEA (Count X).  No claims remain against the DOE and named Defendants in their official capacities.

The court GRANTS Kilborn's motion on the following claims: HRS § 378-2(2) (Count III), punitive damages (Count IV), § 1983 (Counts V and IX), IIED (Count VI), and § 1981 (Count VII).  There are no remaining claims against Kilborn in her individual capacity.

//

//

//

//

//

//

Although this Order disposes of all of Plaintiff's claims against all Defendants, the court has filed concurrently an Order To Show Cause Why Sanctions Should not be Imposed against Plaintiff's attorney, Mr. Wooten.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, January 25, 2008.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Stucky v. State of Hawaii et al.*, Civ. No. 06-00594 JMS/KSC, Order (1) Granting Defendants State of Hawaii Department of Education and Catherine Kilborn's Motions for Summary Judgment; (2) Denying Plaintiff's Motion for Rule 56(f) Continuance; and (3) Striking Portions of the Declaration of Samuel Moore